## LILLY M. CHAMBERS *vs.* THE WOODBURY MANUFACTURING CO.

*Master and Servant—Injury to Young Employee From Dangerous Premises—Sufficiency of Evidence.*

Plaintiff, when a girl eleven years old, was employed with other young girls, in defendants' cotton mili to take full bobbins off the frames and put empty ones on. When not so engaged these girls were sent by defendant's manager to a platform or bridge to wait until called back to remove bobbins again. They spent about fifteen minutes each hour waiting on the platform. The platform was about thirty feet above the floor and was four feet wide. It had no seats and no railing for protection on one of its sides. Plaintiff while sitting on the floor of this platform, in the course of play with another girl, fell to the ground and was injured. The evidence showed that the platform was a dangerous place for children, that defendant knew it to be dangerous and had not warned plaintiff of the danger. *Held*, that there was legally sufficient evidence of defendant's negligence to go to the jury and that it was error to instruct them to render a verdict for the defendant.

*Decided November 21st, 1907.*

Appeal from the Superior Court of Baltimore City (STOCKBRIDGE, J.)

The cause was argued before BOYD, PEARCE, SCHMUCKER, BURKE and ROGERS, JJ.

*Thomas G. Hayes* and *Charles F. Stein* (with whom was *John H. Walraven* on the brief), for the appellant.

*Edward Duffy* (with whom were *Bond & Robinson* on the brief), for the appellee.

ROGERS, J., delivered the opinion of the Court.

This is an appeal from the Superior Court of Baltimore City. The appellant brought her suit in said Court for injuries complained of when she was a girl of eleven years of age and while she was at that time employed in the mill of the appellee. She is now and was at the trial of the case below, an adult woman. This suit was brought by the appellant after she became of age, under the provision of Code, Art. 57, sec. 2. At the trial of this case in the lower Court, the learned Judge, at the conclusion of the appellant's testimony, by an instruction which told the jury that there was no legally sufficient evidence to show that the appellee had "failed in any legal duty owing by the defendant to the plaintiff" directed the jury to render a verdict for the appellee. There are six exceptions. Five of them relate to the admissibility and rejection of testimony, and the sixth relates to the granting of the above-mentioned prayer. The facts are: That the plaintiff in August, 1891, when about eleven years of age, was employed in the appellee's cotton mill, located in Woodbury. Her employment was at first to sweep the floor of the mill. She was afterwards put to "doffing bobbins." This work of "doffing," as explained by the appellant, was "when the frames were run full of cotton around the bobbins, we took the full bobbins off and put the empty ones on, and the frames started and ran until they were full again, and when we got done with the frames we we would go out on this *platform.*"

This platform was a kind of bridge connecting the spinning room with the toilet room. The platform was four feet wide and nine feet long, and on one side it overhung the ground, which was about thirty or forty feet below. The only guard on this exposed side was an insufficient railing made of iron

pipes.   This railing consisted, in the centre of the nine feet of floor, of an upright of vertical pipe and then two horizontal pipes fastened at their ends to the building and in the centre to the upright pipe.   The distance from the floor to the plat-form to the first horizontal pipe was *seventeen inches* and the same distance between the two horizontal pipes.   These "doffer" girls were children of tender years, the appellant being one, and they were five in number,   When these children finished their work in the spinning room—where they "doffed the bobbins"—the older hands then went to work on the ma-chines, and these five children were required and ordered by the boss or superintendent in charge of the spinning room, to go out on this platform and stay there until, by a bell, they were called back in the spinning room to "doff the bobbins." These children, habitually under the orders of the person in charge, spent fifteen minutes of each hour on the platform, idle or unemployed and without seats.   They often spent this time on the platform in play, and often to rest, seated them-selves on the floor of the platform, there being no seats pro-vided.   There being, as above stated, no seats provided, they seated themselves on the floor of the platform near this ex-posed edge of this platform.   All this was known to the ap-pellee.

On the day of the accident the appellant was seated on the floor of the platform, with her back resting against the ver-tical edge of the platform, when one of the children came from the opposite side of the platform and in play attempted to slap her, and in moving her body to avoid the slap she went over the edge between the first horizontal pipe and the floor to the ground below, and was seriously injured.   This dis-tance of seventeen inches between the floor and the first hor-izontal pipe was testified to by witnesses to be sufficiently large for the body of a man to go through.   The appellee, through Mr. James E. Hooper, its superintendent and secre-tary, frequently saw and knew that the appellant and the other children were required and accustomed to remain on this plat-form while waiting to be called back to the spinning room to resume their labors.

Neither a Mr. Kailer, the appellee's representative in charge of these children, and whose orders they had to obey, nor any one else, ever warned or instructed these children of the dangers of this platform.    It also appears in the record that on one occasion, before the appellant fell, an accident came near happening when the children were skating on the bridge. That Mr. Kailer admitted that he knew of the dangerous character of this bridge or platform before the accident in question.    His words were *"expected somebody would fall out of there before they did."*

The record discloses that four uncontradicted witnesses, all of whom had worked in the appellee's mill, testified that these doffer girls were, for 15 minutes each hour, ordered by the appellee's representative to this platform or bridge to make way for the larger girls, and when on this bridge or platform they played, in winter skated, sat on the floor of the bridge, knitted mats, and so remained until called back to the spinning room to resume their work of "doffing the bobbins."

Three competent and qualified experts gave their opinion, and the reasons for it, that this bridge or platform was a dangerous place for children to occupy in play or idleness.    The appellant testified that Mr. John Kailer was the head boss— and that "He would not let us play in the mill, and he would send us out there."    "We were in the big girls way, and that room was right small."    If we would be standing around the room, he would say what are you doing, and we would say nothing, and then he would say go out on the shanty, meaning the platform."

Another witness testified "we were told by Mr. Mike Han, the second boss and Mr. Kailer the first boss to go in the shanty.    We were not allowed in the cross alleys to sit in bobbin wagons, and we were not allowed in the alleys where the spinners were, because we were in the way.    There was no place in these alleys to go.    We were not allowed in the hallway, because they were winding steps, and we were sent out on the porch which, when we were small, and it was called the shanty.

Q. You said Mr. Kailer told you to go out in the shanty?

A. He did.  He would say don't stay around those boxes or in the windows, go out in the shanty; there isn't room in here."

The foreman could not help knowing we were playing, because he would come pass the window and see us there.  All that were standing around would be sent out—thinks they had about nine *doffs* a day, "every time we were through were sent out there by the foreman."  "At times Mr. Kailer would send them out because he would not let them stay in the alleys."  "They would be in the way of the spinners and spoolers and twister winders."  "No, sir, it wasn't a safe place for children."  "No sir, it was not, certainly not."  "Any person or I could roll through under the rail off the floor."  My reason for this is simply because there is no proper protection to keep them from falling."  Mr. Kailer, "came to our house that night she fell in the morning, he came to our house that night and told my mother, and he said he expected somebody to fall out of there before they did."  And this witness testified "I head him (Kailer) say, that he looked for that before it did happen."

The testimony tends to show in this case.

1st.  That the appellant was ordered by the appellee's representative to this bridge or platform after she had finished her work of doffing the bobbins until recalled to the spinning room to resume her work.

2.  That this bridge or platform because of improper and defective guarding between the middle rail and the floor was a dangerous place for children of tender years.

3.  That the appellee before the accident knew of the dangerous character of this bridge or platform for children of tender years.

This testimony was given by the appellant was uncontradicted and for the purposes of this case might be taken as conceded.  And the question for us to decide is as a matter of law, was the Court below right, in granting a prayer taking the case from the jury?

What is the law governing the duty of master to child serv-
ants of tender years, when placed in a dangerous and exposed
place or situation.   When an employee places a young and
inexperienced person at work in an exposed and dangerous sit-
uation, he is bound to give him due caution and instruction, and
his failure to do so is not excused by the fact that the servant,
by the use of his eye sight might have seen the peril and
avoided it.   It is the duty of one who employs young persons
in his service to take notice of their apparent age and ability,
and to use ordinary care to protect them from risks which
they cannot properly appreciate, and to which they ought not
to be exposed.   This is a duty which cannot be delegated,
and any failure to perform it leaves the master subject to the
the same liability, with respect to such risks, as if the child
were not a servant.   For this purpose, the master must in-
struct such young servants in their work and warn them
against the dangers to which it exposes them, and he must
put this warning in such language as to be sure they under-
stand it and appreciate the danger.   For it is not enough that
he should do his best to make children understand.   They
must not be exposed to dangers which they do not fully un-
derstand in fact.   Bearing in mind the natural forgetfulness of
youth, he must renew this warning from time to time, as may
be reasonable and necessary.  And if the servant has not capacity
enough to understand the warning and appreciate the danger,
or for other reasons does not in fact understand it, the master
will be liable for any injury which such servant may suffer in
consequence, if continued at such work.   1 *Shear & Red. on
Neg.*, sec. 219, p. 386.   This Court in *Lorentz* v. *Robinson*,
61 Md. 70, has applied this principle.   If the injury results to
the servant from the direct act or negligence of the master, as
when he is personally present superintending the work and
giving orders, he is answerable for the damages to the same
extent as if the relation of master and servant did not exist.
This doctrine is illustrated by cases where the master with-
out warning him of the danger, orders the servant into a sit-
uation which the master knows, and the servant does not know

to be dangerous and the latter obeys and is thereby injured. Applying the principles laid down to the facts set out in the record—and not controverted, viz, the orders of Kailer, the manager, to this appellant to go upon the bridge or platform. The testimony that it was a dangerous place for children coupled with the fact that the plaintiff was a child of only eleven years. No warning to this inexperienced servant, knowledge of the danger by the master, as is evidenced by the declaration of Kailer "that he expected somebody to fall out of there before they did," and the ignorance of the danger by the servant, the only inquiry is, was the master negligent? We think there can be but one answer, and that is, that the appellee was guilty of negligence, because a master must look out for the child, and must see that it is not exposed to danger arising from the structure of building or machinery which an operator of ordinary intelligence and experience would perceive. Notice of danger is not enough. The child must have sufficient instruction to enable him to avoid danger. This is exactly what the master did not do in this case. It ordered five children of tender years to spend fifteen minutes of each hour on a bridge which had one of its sides defectively and dangerously guarded, and shown by uncontradicted evidence to be a place of imminent danger to these children. JUDGE ALVEY speaking for this Court in *B. & O. R. R.* v *State, use of Fryer*, 30 Md. 52, uses this language: "The deceased (child of five years old) it is true was bound to use ordinary and reasonable care to avoid the consequence of the defendant's negligence, as a condition upon which this action could be maintained; but these terms are relative and dependent, and whether such reasonable and proper care was used on the part of the deceased, can only be determined by considering her age and capacity. Ordinary and reasonable care, under the circumstances, is that degree of care alone, that we might reasonably expect from one in the situation and condition of the deceased; and as she was a child of but five years of age, the decree of intelligence which she was capable of exerting for her rescue from danger, we may suppose to be small. This, however, should not release

the defendant of its liability for the consequnces of its wrongful act." Again, this Court in speaking upon the same principle of law has said: This Court has also distinctly recognized the rule that a child, so far as he is personally concerned, is to be held only to such degree of care as ought to be reasonably expected from children of his age and intelligence." *Balto. City Pass. Railway* v. *McDonnell,* 43 Md. 551.

This Court in *P. B. & W. R. Co.* v. *Devers,* 101 Md. 343, where there was a watch box prepared for its servant to occupy when not engaged in giving signals to passing trains affirms this principle. This watch box was placed too near the track, and was struck by a passing train of the defendant while the signal man was occupying it resting from his labors, and the servant was injured. JUDGE PAGE speaking for the Court uses this language: "The substantial question in the case is whether this watch box, under the circumstances of this case, falls within the familiar rule that requires the master to exercise reasonable care to provide and maintain proper and safe machinery, appliances and places for his employees, and such duty he cannot avoid by showing that he has used reasonable diligence in the selection of his agents to perform the work. In such a case the negligence of the servant to discharge this duty would be negligence imputable to the master, for which he would be responsible, and this is because there rests on the master a positive duty which he cannot delegate." So that if the appellee, or the person representing him in this case, selected this bridge or platform for this appellant and her fellow servants of tender years and ordered them to spend fifteen minutes of every hour of their employment idle and without seats on said bridge or platform waiting to be called back to work the appellee was responsible to the appellant for the injuries received. Nor does the fact that the appellant was resting at that time, and not actively engaged in her duties, take her out of the employment or relieve the appellee from care due to its servants. In this case the place must be conceded upon the proof to have been dangerous. The appellant was ordered there by the appellee's manager, and

not warned of the dangers surrounding her. We think the Court should have left it to the jury to say under all the facts and circumstances, having regard to her age, her entire ignorance or lack of warning of the danger together with the fact that she was ordered to go out upon the bridge by the appellee or its agent. This appellant certainly did not occupy the position of a mere stranger to the appellee to whom no duty was owing, for it was shown that it was customary for these very children to use the bridge as a place of rest. The master, knowing that the bridge or platform was so used, and not objecting thereto, impliedly licensed them to use the bridge in this manner, and if they together with the appellant were ignorant of the danger in the exercise of ordinary care so as to avoid the injury, and that the appellant used and occupied the bridge or platform when not actively engaged in her duties, with the knowledge and consent of the employer, then a duty was imposed upon the employer to properly guard and protect her, or to give notice of the danger to the appellant or those whom he should reasonably apprehend might be likely to be injured by such omission to warn or protect, for these children together with the appellant were on this dangerous bridge or platform under the implied license of the appellee, ordered there and known to be there by James E. Hooper, which made the master liable, for its failure to protect or warn these children of the unguarded side of this dangerous bridge. When a master assigns orders or invites a servant, impliedly or otherwise into or upon his premises it is the duty of the master to exercise ordinary care to make and maintain it in a reasonably safe condition. He has no right to expose his servants to risk and danger. It is his duty to know that the premises are safe, and that the operatives may use the premises for the purposes for which they are designed without personal risk or peril to life or limb. This appellant was acting as much in the line of her employment when permitted or ordered upon this bridge or platform to rest and be out of the way of other employees as if she were going to take her meal, or if she had gone on a call of nature to a water closet attached to the building.

JUDGE COOLEY in *Powers v. Harlow*, 53 Mich. 507, thus lays down the law "children, wherever they go, must be expected to act upon childish instincts and impulses; and others who are chargeable with a duty or care and caution to work them must calculate upon this and take precautions accordingly. If they leave exposed to the observation of children anything which would be tempting to them, and which they in their immature judgment might naturally suppose they were at liberty to handle or play with, they should expect that liberty to be taken."

Again in *Cooley on Torts*, p. 553. "The master may be guilty of actionable negligence in exposing persons to perils in his service, which, though open to observation, they by reason of their youth or inexperience do not fully understand and appreciate, and in consequence of which they are injured. Such cases occur most frequently in the employment of children." So it may be safely laid down as a rule that those persons who employ children about dangerous places, should anticipate that they will exercise only such judgment, discretion and care as is usual among children of the same age under similar circumstances, and are bound to use due care, having regard to their age and inexperience, to protect them from the dangers incident to the situation in which they are placed, and use reasonable precaution in the exercise of such care, in their behalf; it is the duty of the employer to so instruct such employees concerning the dangers connected with their employment, which from their youth and inexperience they may not appreciate or comprehend, that they may by the exercise of such care as ought reasonably to be expected of them, guard and avoid injuries arising therefrom.

While employers are not insurers of the lives and limbs of their employees, they do impliedly engage that they will not expose them to the hazard of losing their lives, or suffering great bodily harm, when it is neither reasonable nor necessary to do so. Of course there can be no negligence where there is no duty that is due; for negligence is the breach of some duty that one person owes to another, and the duty varies

with circumstances and with the relation to each other of the individuals concerned, so the alleged negligence varies, and the act complained of never amounts to negligence in law or in fact; if there has been no breach of duty—for in order to maintain an action for an injury to person or property by reason of negligence or want of due care, there must be shown to exist some obligation or duty towards the plaintiff which the defendant has left undischarged or unfulfilled. This is the basis upon which the cause of action rests—and the application of these principles to the facts disclosed by the record in this case is, that the appellant was still in the appellees employ at the time of accident for she was only resting from her usual labors and could in no sense be termed a mere licensee. She was not given a permit to go upon the shanty. She was told to go there, not once, for it appears to have been almost an hourly occurrence for when they, together with the plaintiff were not engaged in "doffing" they were furnished with the shanty as a place of rest, and shelter from the weather. Another inquiry is: To what tribunal, the Court or jury, does the law confide the right and duty to determine the question of negligence *ve. non* of the master under circumstances of the case at bar? The answer to this question is that it is the jury always, under proper instructions, and never of the Court, unless the want of evidence is so clear and obvious, that assuming all the evidence offered by the plaintiff·to be true and adding thereto every inference which may be fairly and legitimately drawn therefrom, it was insufficient to warrant the jury, in the exercise of a reasonable intelligence, to find on the issue in favor of the plaintiff. The want of evidence must be clear and obvious in order to justify the Court in directing at the close of the plaintiff's case a verdict in favor of the defendant.

There certainly is evidence in this case to show that the bridge or platform was in an unsafe condition for the children together with this plaintiff to occupy and that the injury happened in consequence; that the defect must have been known to the appellee and should have been remedied; that the appellant was acting in obedience to orders in what she was

doing; and that she was ignorant of the source of danger existing at the moment of danger. A case should never be withdrawn from the jury, unless the conclusion follows as matter of law, that no recovery can be had upon any view which can be properly taken of the facts the evidence tends to establish. *B. & O. R. R. Co.* v. *Belinski*, ante p.

Without extending this opinion further or multiplying authorities, we conclude that the learned Judge erred in instructing the jury "that there is no evidence in this case legally sufficient to show that the defendant, the Woodbury Manufacturing Company of Baltimore County, failed in any legal duty owing by the defendant to the plaintiff, and that their verdict must therefore be for the defendant."

> *Judgment reversed and new trial awarded, with costs to the appellant above and below.*