STATE OF MARYLAND, TO THE USE OF PINGUESTA
DUCAS, MOTHER OF PETER DUCAS, INFANT, DECEASED,

*vs.*

FERDINAND BERNHEIMER AND HERMAN BERN-
HEIMER, CO-PARTNERS, TRADING AS BERNHEIMER
BROTHERS.

*Negligence: employer and employee; children.    Elevators: used
without authority.*

The duties upon the part of an employer become more im-
perative towards minors in his employ.                        p. 346

But for an employer to be held responsible for injuries to an
employee, there must be, proved negligence by the one, and the
injury to the other; and between these facts there must exist the
relation of cause and effect.                                 p. 345

A boy in a department store, in spite of the fact that the
rules of the establishment forbade him from running the ele-
vators, attempted to run one of them, and in so doing disre-
garded the specific warnings given him; he was killed through
his improper management of the elevator: *Held,* that since there
was no evidence of negligence on the part of the employer, and
since the boy put himself, without direction or permission, in a
position of peril which must have been apparent to him, recov-
ery against the employer was barred.                          p. 347

*Decided November 17th, 1916.*

Appeal from the Superior Court of Baltimore City. (AM-
BLER, J.)

The facts are stated in the opinion of the Court.

The cause was argued before BRISCOE, BURKE, THOMAS,
PATTISON, URNER and STOCKBRIDGE, JJ.

*George Moore Brady* (with whom were *Soterios Nicholson, Wm. Milnes Maloy* and *Wm. J. Tewes* on the brief), for the appellant.

*George Winship Taylor* and *George Weems Williams* (with whom were *Marbury, Gosnell & Williams* on the brief), for the appellees.

BURKE, J., delivered the opinion of the Court.

This suit was brought by the State to the use of the mother of Peter Ducas, a fifteen year old boy, against the appellees to recover damages for the death of said infant which it is alleged was caused by the negligence of the defendants. At the conclusion of the plaintiff's case the trial Court directed a verdict for the defendants, and this appeal was taken from the judgment entered on the verdict. There are certain uncontradicted facts appearing in the record which will now be stated.

Bernheimer Brothers, the appellees, conduct a large store in Baltimore. This store, which consists of two buildings, fronts on Lexington street and extends south to Fayette street, with a front also on that street. The Fayette street portion of the store is connected on the second floor with the Lexington street portion by a bridge across an alley, which runs east and west, separating the two buildings, spoken of in the evidence as Marion street. About the center of what we shall designate as the Lexington street building and against the Marion street wall the defendants installed and have been using in their business a freight elevator. The entrance to the elevator on the second floor was by a sliding wooden door with no opening in it. This door was about six or seven feet high, and to reach the elevator from the second floor it was necessary to raise, or slide up this door. On the second floor near the elevator door, on the night the boy was killed, there were some arc lights burning. There was no fixed light in the elevator shaft, but when the door of the elevator on the second floor was raised the light from the lamps men-

tioned was thrown into the shaft, and there was also some light thrown into it through a window in the elevator shaft near the door.

Peter Ducas was in the employ of the defendants. He had been working on the sixth floor of the Fayette street building, but for the two or three months preceding the accident he had been working on the second floor of the Fayette street building as a stock boy under Joseph E. Burke, who had charge of that floor. It was not a part of the duty of Peter Ducas to run the elevator, and he was not directed to do so. The defendants had an employee to operate the elevator, but at the time of the injury and for an hour or so preceding it he was off that particular duty. The boys in the store were allowed to use the elevators in the building, but not to run them.

On the night of January 10, 1914, Mr. Burke instructed Peter Ducas to take some shirt waists from the second floor of the Fayette street building to the first floor of the Lexington street building. The boy put the shirtwaists on a truck and wheeled them over to the elevator, where he took some of the waists off of the truck. What then occurred is testified to by the only two witnesses who saw the accident, viz., Barney B. Barr and Ralph Sachs. We here quote from the testimony of Mr. Barr: "The witness was present when the accident occurred on Saturday night between 9:30 and a quarter to ten; he was leaning against a counter in the shoe department; he had seen the boy coming across with the truck I guess to be taken downstairs, and he had placed the truck outside of the candy counter, which is in front of the elevator, and went around to open the door to bring the elevator up; he had opened the door and placed the door on his shoulder and he pulled the rope which naturally brings the elevator up; there was a young girl in the candy department at that time yelled at the boy and told him to close that door, that it was cold up here, and Mr. Sachs, who was manager, heard that, and told the boy to close that door and naturally that

boy had turned around to hear Mr. Sachs, and the elevator had come up at the time and caught him right in his chest and took him up with the door; this girl had seen it and yelled and everybody naturally looked up and seen what it was and seen his feet hanging, and somebody went over and pulled the rope; he didn't know who; and he stopped the elevator; he was caught between the second and third floor."

When the elevator was stopped the boy was dead. His body was jammed between the door and the elevator. The witness Knighton said: "Nobody was on the elevator but the boy at the time when it was up to the top with him jammed in there. His head and shoulders were on the waiter. He had his coat on. The door held him on his back. He could not get up any other way. His breast was on the floor of the waiter and the door on his back. His head and breast were both on the elevator and the door of course covered his back."

The testimony of Ralph Sachs, who was the floor manager on the Lexington street side, corroborated that of Barr in some particulars, but in others is confused and a little difficult to understand. He testified that he saw the boy lift the elevator door. That it was a stormy night and that one of the girls in the department said, "for Heaven's sake get that door down, a draft is coming through. I said, turning to the boy, for Heaven's sake put down that door." He said that the boy instead of putting the door down, lifted the door up and got back of it, when I said, be careful, or something like that, I don't remember what—he gets hold of the check rope and gets the door in back of him and the check rope and the elevator comes up with it, and he is caught on the inside of the door with the check rope in his hand. The boy had a check rope, it could not have been possibly more than a minute that the place was open before the people called; witness is absolutely positive that the boy put his hand on the rope. * * *

"Q. You told him to close the door, but he didn't have to get underneath it, did he? A. No, sir; you could close the

door without taking hold of the check; it come down with a bang. Q. Was the elevator coming up at that time? A. The elevator was not coming up until he attempted to use the check rope. Q. Why did he use the rope? A. For the simple reason when he saw his life was in danger he tried to get hold of the rope to keep himself from falling. Q. What put his life in danger before he caught the rope? A. Getting back of the door; he had no way to support himself. Q. What kind a door was it, a door that went up and down? A. A door sliding up and down, a great big door, wooden frame going up and down. Q. How did he get back of that door when he closed it? A. I didn't say that; I said in attempting to go back and close the door instead of getting in front he goes back of the door and gets the check rope up and he was wedged in back of the door and elevator. Q. You told him to close the door; that is your first statement? A. Yes; that is my statement. Q. Are you sure you didn't tell him to go inside and close the door? A. Absolutely not. Q. You say he got inside the door; how? A. He simply got underneath the door, I suppose like most foolish boys playfully got underneath the door, and when he saw the possibility of him falling down into that pit, the elevator was then at the bottom, he got hold of the check."

The foundation of the plaintiff's claim is that the death of the boy was due to the negligence of the defendants. Before there could be a recovery the plaintiff was required to allege and prove a breach of duty on the part of the defendants and that the death resulted from that negligence. "There must be negligence, and there must be an injury, and between these there must exist the relation of cause and effect." *Levy* v. *Clark*, 90 Md. 146. Upon the evidence offered in support of the plaintiff's case, it cannot be held that the negligence of the defendants caused the death of the boy. If the testimony of Mr. Barr be accepted he was attempting to do something which he was not authorized to do, viz., to operate the elevator. If that of Mr. Sachs be believed, instead of putting down the door when he was told to do so, he leaned over into

the elevator shaft and pulled the check rope which moved the elevator and thereby brought the elevator up. He put himself, without the direction or permission of his employers, in a position of peril which must have been apparent to him. Upon either hypothesis there can be no doubt that the conduct of the unfortunate boy directly contributed to his misfortune and that it bars a recovery in this action.

The appellant cites and relies upon a line of cases which announce the familiar rule that it is the duty of the master to warn a servant of tender years of the perils incident to his employment. This rule finds its most frequent application in cases in which a young and experienced servant has been put to work on or about machinery of various kinds. It has been frequently applied by this Court. *Levy* v. *Clark,* 90 Md. 146; *Hockaday* v. *Schloer,* 125 Md. 677; *Chambers* v. *Woodbury Mfg. Co.,* 106 Md. 496; *National Enameling Co.* v. *Brady,* 93 Md. 646.

In the last cited case, JUDGE SCHMUCKER said: "Even in cases of employment generally of persons of immature age to work in factories where machinery is used the authorities agree that if the operation of a machine involves danger to an inexperienced person both justice and humanity impose upon the employer, when directing a youth without previous knowledge of the machine to work upon it, the duty of giving him such warning or instruction as would enable him to operate it safely by the use of that degree of care which might reasonably be expected of him. *Hettchen* v. *Chipman,* 87 Md. 729; *Levy* v. *Clark,* 90 Md. 150; *Grizzle* v. *Frost,* 3 Foster & Fin. 625; *Glover* v. *Dwight Mnfg. Co.,* 148 Mass. 25; *Neilsen* v. *M. & M. Paper Co.,* 75 Wis. 585; *The Pittsburg, C. & St. L. R. R.* v. *Adams,* 105 Ind. 165; *Robertson* v. *Cornelson,* 34 Fed. 716. This duty upon the part of the employer becomes more imperative in instances when the employment is special and the hazard to which he by his direction subjects the minor employee is not within the contemplation of the contract of service. *U. P. R. R. Co.* v. *Fort,*

17 Wall. 553 (84 U. S.); *Hinckley* v. *Horazdowsky,* 133 Ill. 359; *C. & N. W. R. R. Co.* v. *Bayfield,* 37 Mich. 205." But in none of these cases are the facts analogous to those of the case at bar. It was no part of the duty of Peter Ducas to run the elevator. He was not allowed to run it, and his death was caused, either in attempting to operate it, or by projecting his body into the elevator shaft and grabbing the check rope to save himself from injury. If Sachs' evidence be true, the boy disregarded his positive order to put down the door, and voluntarily placed himself in a situation of open and obvious danger. We are unable to find in the record any evidence legally sufficient to show that the death of the boy was the result of the negligence of the defendants. The uncontradicted facts show that it was his own want of care and caution that was responsible for his sad and untimely death.

During the trial the plaintiff reserved four exceptions to rulings on evidence. We find no reversible error in any of these rulings. In the first exception the witness Burke was asked if at the time of the accident he had posted any certificates from the Bureau of Statistics and Labor giving authority to employ the boy. As the failure to post such a certificate had no relation whatever to the death of the boy, the evidence of such failure was properly excluded. The question asked in the second exception was based upon a misunderstanding of the previous evidence of the witness, and in the form in which it was asked the Court was right in refusing to allow it to be answered. The third and fourth exceptions relate to offers of evidence to show who had the possession and control of the boy at the time of his death. It is manifest that this evidence in the view we have taken was wholly immaterial.

*Judgment affirmed, with costs.*